# Supreme Court of Texas

No. 20-0975

Wesley Rattray, Marco Nunez, Martha Saavedra, Antonio Vindell, Carmen Pashos, Steve Tullos, Cesario Pedraza, Minerva Pedraza, Roger Luly, Nora Gonzalez, and Rosalinda Castillo,

*Petitioners*,

v.

City of Brownsville, Texas,

*Respondent*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

**Argued October 27, 2022**

JUSTICE YOUNG delivered the opinion of the Court.

The Texas Tort Claims Act waives governmental immunity for "property damage" that "arises from the operation or use of . . . motor-driven equipment." Tex. Civ. Prac. & Rem. Code § 101.021(1)(A). We must decide whether a city's closure of a stormwater gate during a rainstorm, which immediately preceded the flooding of a neighborhood, falls under this waiver of immunity. We hold that petitioners have

1

successfully invoked the statutory waiver, at least at this stage of the case. We accordingly reverse the judgment of the court of appeals and remand to the trial court for further proceedings.

# I

The plaintiffs below, and petitioners in this Court, are eleven homeowners who live in the Quail Hollow subdivision of Brownsville. The homeowners allege that the overflow of a nearby resaca[1] flooded their homes and caused extensive property damage. According to their seventh amended petition, the accumulation of water in the resaca—and its resulting overflow—would not have occurred but for the City's decision to close a stormwater gate during a severe rainstorm.

The rainstorm rolled into the City around noon on a warm day in late August 2015. Jose Figueroa, the City's stormwater manager, was enjoying lunch at a local Chick-fil-A at the time. When Figueroa noticed the rain's intensity, he left the restaurant and directed his crew to report to their assigned posts and monitor the situation. He also instructed Leo Saldivar, the City's raw-water technician, to meet him near the Quail Hollow subdivision. Figueroa wanted to keep an eye on the stormwater flowing from the Resaca de la Guerra—a resaca running through Quail Hollow that serves as part of the City's water-drainage system and which the homeowners describe as a "large waterway."

As in other neighborhoods in the City, Quail Hollow's stormwater

---

[1] A "resaca" is a "former course or channel of a stream." Webster's New International Dictionary 2117 (2d ed. 1934). As the court of appeals noted, the resacas here are "former channels of the Rio Grande found in the southern half of Cameron County." 647 S.W.3d 710, 714 n.2 (Tex. App.—Corpus Christi–Edinburg 2020) (internal quotations omitted).

2

drains into that resaca, which generally flows from west (upstream) to east (downstream). To control the flow of water, the resaca has five sluice gates that open and close. One of those gates—the North Laredo Gate—is immediately downstream of Quail Hollow. The North Laredo Gate typically is kept open. According to the homeowners, motor-driven actuators installed sometime before the rainstorm can remotely open and close the North Laredo Gate.



*Petitioners' Oral Argument Exhibit*

When Figueroa and Saldivar arrived in Quail Hollow, they observed that the North Laredo Gate was open, as usual; that water in the resaca was flowing normally, from upstream to downstream; and that the resaca's water was at a normal level, about thirty feet above sea level. After making these assessments, Figueroa and Saldivar proceeded to check other locations in the City. Except for "high water" in some

3

areas, they observed similar conditions. The South Laredo Gate, for instance, was also open and had normal waterflow.

Figueroa and Saldivar returned to the North Laredo Gate about an hour later. Conditions had changed. They noticed that the resaca's waterflow had reversed course and was now flowing from downstream to upstream (what the parties refer to as "negative waterflow"). In response, Figueroa closed the North Laredo Gate. He did that, he says, to prevent the resaca's water from overflowing into Quail Hollow.

After Figueroa closed the gate, he and Saldivar continued their watch in the unrelenting rain. They returned to various areas in the western part of the City and decided to place portable water pumps near some of the other gates to push water downstream and away from Quail Hollow. They also observed, again, that the water near the South Laredo Gate had normal waterflow. But because of high water levels in other areas, they carried on with the task of pumping water out of the resaca.

After Figueroa and Saldivar began pumping water out of various parts of the resaca, they returned to the North Laredo Gate, which was still closed. Once again, conditions had worsened. Amidst the heavy rainfall and negative waterflow, the water had risen to about knee-deep over Laredo Road and begun spilling over into Quail Hollow. Both Figueroa and Saldivar witnessed the water flow over Laredo Road; there was nothing they could do to stop it, they said. All told, the severe "supercell" rainstorm dropped about four to six inches of water onto the City within approximately three hours.

The homeowners allege that about two feet of water from the resaca spilled over its banks and into their homes. To recover for their

property damage, the homeowners sued the City for negligence under the Tort Claims Act. They alleged that the City and its employees should have known that abnormal waterflow at the North Laredo Gate was only "temporary," that closing the gate would trap the water, and that its resulting accumulation would cause the resaca to overflow and flood their neighborhood. Based on those allegations, the homeowners invoked § 101.021(1)(A) of the Act,[2] which waives immunity for "property damage" that "arises from the operation or use of . . . motor-driven equipment."[3] In response, the City filed a plea to the jurisdiction. It asserted, among other things, that the homeowners' allegations concerned the nonuse, rather than the use, of motor-driven equipment, and that there was no evidence that the North Laredo Gate's closure caused the homeowners' property damage.

The trial court denied the City's plea. A divided court of appeals reversed. 647 S.W.3d 710 (Tex. App.—Corpus Christi–Edinburg 2020). The majority sided with the City on both points. As for the first, it held that "the gravamen of the [homeowners'] complaint is based on the City's nonuse of the North Laredo Gate," *id.* at 718, underscoring the homeowners' various allegations about how the gates were *not* opened and how the pumps were *not* activated, which allegedly led to the overflow, *id.* at 718–19. As for the second, the majority held that "the

---

[2] Unless otherwise stated, references to and citations of statutory provisions are to the Texas Tort Claims Act as codified in the Texas Civil Practice and Remedies Code.

[3] In addition to alleging misuse of the North Laredo Gate, the homeowners also pleaded that their damages arose from misuse of the motor-driven water pumps. Whether those pumps would also qualify under the statute is not before us and we express no opinion on it.

5

mere act of closing or failing to open a gate does not cause flooding," because "[i]f no rainstorm had occurred . . . and the City closed the North Laredo Gate, the homeowners would not have suffered property damage." *Id.* at 720. Accordingly, the court of appeals directed the trial court to dismiss the homeowners' suit for lack of jurisdiction. *Id.* at 722. The homeowners then filed a petition for review, which we granted.

## II

We begin our review of the court of appeals' judgment by addressing the jurisdictional nature of the homeowners' suit.

## A

The homeowners assert tort claims against the City, a subdivision of the State of Texas. They therefore must overcome the City's governmental immunity. *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011). They can do so only by demonstrating that the legislature, as the branch of government constitutionally empowered to manage the State's financial affairs, has waived immunity by statute. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). Without such a waiver, the court would lack jurisdiction to proceed. Accordingly, if a Tort Claims Act plaintiff cannot satisfy "the burden to affirmatively demonstrate the trial court's jurisdiction" by showing that the claim falls within a statutory waiver of immunity, the court must dismiss the suit. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019); *see also Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

The requirement to show that a claim falls within a statutory

6

waiver of immunity sounds simple enough, but the volume of our Tort Claims Act cases illustrates how complex it often turns out to be. That complexity is at least mitigated by focusing on the foundational principle that the Act's text and structure guide every determination of whether a plaintiff has met the burden to show a waiver. The starting point is always the status quo: a presumption against any waiver until the plaintiff establishes otherwise. To do so, a plaintiff may invoke various provisions in Subchapter B of the Act that affirmatively describe when immunity is waived. Without such a provision, no court is empowered to hear tort cases against and impose liability on "governmental unit[s]." The Act's detailed descriptions of the contours of the waiver of immunity delineate the extent of the judicial authority. A plaintiff must begin, therefore, by alleging circumstances that fit within a provision of the Act that authorizes a waiver, such as the homeowners' assertion here that the flooding of their homes followed from circumstances described in § 101.021(1)(A).

But a plaintiff cannot stop there. The Act also provides various exceptions or caveats that function as a withdrawal of the waiver, and thus of the court's jurisdiction to proceed, under certain conditions. Some exceptions turn on the kind of defendant who is named. Even when allegations would otherwise describe circumstances within the Act's waiver, for example, the Act withdraws that waiver for any "claim arising from the activities of the state military forces when on active duty under the lawful orders of competent authority." § 101.054; *see also, e.g.*, §§ 101.052–.053 (similar limitation for suits against legislators and judges). Other exceptions to the waiver may turn on the legal theory

7

that a plaintiff deploys. If, for example, a claim against certain governmental defendants depends on "[t]he common law doctrine of vicarious liability because of participation in a joint enterprise," § 101.0211, then any waiver of immunity is withdrawn as to that claim even if the claim otherwise would be within the waiver. A third type of exception eliminates the waiver for certain kinds of actions. For example, the waiver of immunity does not apply to "a claim arising . . . from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action" either complied with laws governing emergency situations or, "in the absence of such a law . . . , if the action is not taken with conscious indifference or reckless disregard for the safety of others." § 101.055(2). Nor is immunity waived for claims challenging the failure to undertake a discretionary act. § 101.056 (titled "Discretionary Powers").[4]

Finally, assuming that a plaintiff successfully establishes a waiver and negates any relevant expressed withdrawal of the waiver, the Act also contains some provisions that operate to limit recovery. For example, § 101.024 eliminates the availability of punitive damages and § 101.023 "limits the amount of the government's liability . . . depend[ing] on the type of governmental unit being sued[.]" *Gulf Coast Ctr. v. Curry*, 658 S.W.3d 281, 285 (Tex. 2022). As we recently said in *Curry*, "a trial court must ascertain, as part of determining its

_____

[4] "This chapter does not apply to a claim based on: (1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or (2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit."

jurisdiction, whether *and to what extent* the Tort Claims Act waives immunity from suit." *Id.* at 286.

**B**

Consideration of each of those defining features of immunity is essential to the jurisdictional inquiry that lies at the heart of litigation under the Texas Tort Claims Act. Taken together, these features implicate the judicial branch's very authority to act—a limitation on jurisdiction that protects the separation of powers inherent in our constitutional order. In private litigation, parties risk no larger constitutional values if they waive or forfeit claims and defenses that are personal to themselves; such matters lack jurisdictional significance in any sense. The Tort Claims Act, though, represents a delicate balance that the legislature alone can strike. Even if a governmental unit would be happy to waive "its" immunity, it is not the governmental unit's immunity to waive. More to the point, the *courts* cannot be part of any such transaction. One key reason that we use the "jurisdictional" label is because it reflects the judicial obligation to adjudicate only those claims that are authorized without trespassing on the authority of the political branches.

This concern for ensuring the integrity of the judicial process—and the entirety of the separation of powers—is why courts that detect a non-waivable jurisdictional problem may at any time demand that the parties resolve the resulting doubts about whether the case may proceed. A court that raises a jurisdictional issue does not aim to serve the interests of one side or the other. Instead, such a court discharges its duty to ensure that the court itself is functioning in an authorized and properly judicial

9

capacity. For the same reason, the parties likewise remain duty-bound for as long as they invoke or submit to a court's authority to confirm the presence of jurisdiction and to raise jurisdictional defects.

As a general matter, a plaintiff initially discharges this burden by alleging facts that bring a claim within the waiver. But being "within" the waiver entails *both* key parts described above: satisfying the provisions that clearly and affirmatively waive immunity *and* negating any provisions that create exceptions to, and thus withdraw, that waiver. The Act may waive immunity in one breath and in the next take back part of the waiver. *Both* parts of the analysis are needed to answer the common issue that underlies every Tort Claims Act case: *whether immunity is waived.* Imagine a building with this sign: NO VISITORS WELCOME (akin to the default status of "no suits permitted" because of immunity), followed by EXCEPT IN THE SUMMER (like the affirmative statutory waivers of immunity). A visitor on the first Saturday in August, though, would still be a trespasser if the sign continued BUT NEVER ON WEEKENDS (playing the role of the Act's various withdrawals of parts of the waiver of immunity). The sign *could* have said VISITORS WELCOME ON SUMMER WEEKDAYS ONLY. And the Act *could* have phrased its own waivers in highly detailed terms that do not rely on separate exceptions. The consequence of how the legislature actually framed the Act, however, is that plaintiffs can affirmatively establish jurisdiction only if they show that their claims are *not* within the withdrawn part of the waiver.

To be sure, no great effort is needed to negate many or indeed most statutory exceptions to the general waiver of immunity. A plaintiff

10

has never had to march through the Act provision by provision. Pleadings whose affirmative allegations functionally exclude the exceptions are typically sufficient. Plaintiffs thus need only expressly negate those exceptions that their allegations plausibly implicate, which will depend on the nature of the dispute. It will be readily apparent in most cases, for example, that the defendant is not a state legislator and is not being sued for an "act or omission . . . in his official capacity" as a legislator, § 101.052, so plaintiffs will not need to affirmatively or explicitly negate that exception (or any other plainly inapplicable one) in their pleadings.

A governmental defendant, in turn, plays its role by identifying where jurisdiction might be lacking and raising any such deficiencies, most commonly in a plea to the jurisdiction, as the City deployed below. If a plaintiff has *not* shown that a claim affirmatively falls within a statutory waiver, the defendant should say so. Likewise, if the plaintiff omits or otherwise fails to negate a relevant exception to the waiver, the defendant should speak up. Both sides may develop and introduce evidence to support their contentions. This iterative process will ensure that both sides present their jurisdictional arguments to the court, which can play *its* continuing role of assessing its own jurisdiction.

The rigor of proof required to satisfy a court that jurisdiction is present increases at each stage of litigation, as with disputes over traditional subject-matter jurisdiction. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that jurisdictional "facts (if controverted) must be supported adequately by the evidence adduced at trial" (internal quotations omitted)). And as our decision in *Curry* reflects, this jurisdictional analysis continues all the way past a verdict:

11

"When . . . the plaintiff establishes that the Act applies but fails to establish which cap applies, the plaintiff has failed to demonstrate that the trial court has jurisdiction to render a judgment exceeding the minimum statutory cap." 658 S.W.3d at 283.

Just one valid jurisdictional obstacle is enough for the court to halt further proceedings. The fundamental rule is that the court may not reach the merits if it finds a single valid basis to defeat jurisdiction. When one such ground exists, it is not necessary that *every other* potential jurisdictional defect be raised, fleshed out, or resolved at the outset. When defendants challenge jurisdiction on multiple grounds,[5] courts are therefore not duty-bound to address them all if any one of them warrants dismissal (although addressing multiple grounds, as the court of appeals helpfully did in this case,[6] may be more efficient and may prevent further proceedings after an appeal). *See, e.g.*, *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (describing courts' "leeway to choose among threshold grounds for denying audience to a case on the

---

[5] Raising all reasonably available objections early is best practice and most efficient even if it is not absolutely required. A defendant that sports with the court by making seriatim, piecemeal objections to jurisdiction that could have been raised up front may lose credibility, of course. Plaintiffs bear the burden to *establish* jurisdiction, so they subject themselves to some risk by waiting for a plea to the jurisdiction (or other appropriate vehicle) to establish a waiver of immunity or to attempt to negate clearly relevant exceptions to the waiver rather than doing so from the start. But we recognize that, in some challenging cases, the parties may not anticipate their opponents' positions, which is why our process permits the development of the argument through discovery and competing motions.

[6] *See* 647 S.W.3d at 719 (observing, after rejecting jurisdiction on one dispositive ground, that "even if the homeowners' complaint stemmed from the use of equipment, their damages did not arise from that use" and proceeding to resolve the other issue presented, thus facilitating our review).

merits" (internal quotations omitted)). As a corollary, the court may not move to the merits if even one jurisdictional argument remains unresolved.

The statement that courts have the authority and indeed the duty to resolve any jurisdictional doubts that arise before proceeding to the merits does not mean that we expect courts to become Inspector Javert, hunting for defects that the parties do not see or raise. Courts are empowered to note potential jurisdictional defects sua sponte, but the adversary process remains the touchstone of litigation even in this context. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 102 (Tex. 2012) (Hecht, J., concurring). True, we have often said that sovereign immunity "implicates" a court's subject-matter jurisdiction, *e.g.*, *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016), such that an opinion in the face of a valid assertion of immunity may correctly be called "advisory," *Rusk*, 392 S.W.3d at 95 (maj. op.). But, by the same token, we have also said that immunity does not *equate* to subject-matter jurisdiction. *Engelman Irrigation Dist. v. Shields Bros.*, 514 S.W.3d 746, 755 (Tex. 2017). So while the "implication" of jurisdiction may allow a governmental entity to raise immunity arguments later than at the outset of litigation—even for the first time on appeal, *Rusk*, 392 S.W.3d at 94–96—such issues do not allow that entity, for instance, to collaterally attack a final judgment, *Engelman*, 514 S.W.3d at 751.

In summary, no court should proceed to the merits of a case brought under the Act if that requires turning a blind eye to jurisdictional concerns that the court itself perceives or that the parties have raised. And in the event a court *does* perceive a potential problem that counsel have not raised, the court retains discretion to reserve that issue if it is

13

already prepared to grant a plea to the jurisdiction for a different reason or to otherwise dismiss a case.

## C

As this case comes to us, the parties essentially dispute the applicability of only one provision in the Tort Claims Act—§ 101.021(1)(A), which waives immunity for property damage arising from the "operation or use" of "motor-driven equipment." We have just described the plaintiff's obligation to negate any potentially relevant exception at the outset by, at a minimum, filing pleadings containing allegations that, if true, would displace the applicability of such exceptions. In their briefing to us, the parties have not disputed whether the City would otherwise retain immunity even if the two grounds presented for our review do not justify dismissal. Given that the court of appeals believed that it could resolve the case on those two jurisdictional grounds (and either one would suffice), that court had no obligation to consider or raise any further jurisdictional issues, either.[7]

Regardless of whether one or more exceptions to the waiver of immunity may be relevant, none is before us now. We *could* direct supplemental briefing on any other jurisdictional question and proceed to resolve that question ourselves in the first instance, but as a prudential matter, the law is typically better served when the lower courts review

_____

[7] Cases involving statutory exceptions to the waiver of immunity in the context of floods are legion. *See, e.g.*, *City of San Antonio v. Hartman*, 201 S.W.3d 667, 671–73 (Tex. 2006) (considering the applicability of the emergency-situation exception to a flood case); *see also id.* at 673 n.23 (noting other flood cases). Our decision today should not be read to express any view regarding whether those exceptions would apply here.

14

a legal issue before this Court does. "Ours is a court of final review and not first view. Ordinarily, we do not decide in the first instance issues not decided below." *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012) (internal quotations omitted). Nor is there any need for us to do so. Our decision today only reverses the court of appeals' judgment on the grounds considered by that court. We do not affirmatively declare that there *is* jurisdiction. We instead remand for further proceedings, during which the parties and lower courts may determine how best to comply with the Act's jurisdictional requirements.

## III

We accordingly turn to the applicability of § 101.021(1)(A), which provides as follows:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment.

The parties do not dispute that the North Laredo Gate has a motor. Nor do they dispute that Figueroa, a City employee, closed it.[8] They

---

[8] The parties submitted conflicting evidence, however, as to whether Figueroa closed the gate *manually* or *by motor*. For whatever reason, that distinction is important to the waiver of immunity in the context of § 101.021(1)(A). Like the court of appeals, we view the evidence in the light most favorable to the homeowners and presume, for the purpose of answering the questions presented, that Figueroa closed the gate with its motor-driven actuators. *See Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex.

15

instead disagree as to whether the statutory phrase "operation or use" encompasses the allegations and record facts established here and, if so, whether the homeowners' property damages "arose from" that operation or use.[9]

## A

We turn first to whether the City's "operation or use" of the equipment is even at issue here. The homeowners argue that the City operated or used the gate by closing it to block water, which is the gate's intended purpose. This "use," they claim, caused the flooding because closing the gate allowed the water to accumulate and overflow into their

2019).

[9] The parties dispute, and the court of appeals addressed, only the "arises from" standard in § 101.021(1)(A), and not the "proximately caused by" standard in § 101.021(1). As shown by the statutory text, and as we have previously noted, these are two "separate and independent requirements," so "[s]atisfying the 'arises from' requirement does not excuse a plaintiff from demonstrating proximate cause." *City of San Antonio v. Riojas*, 640 S.W.3d 534, 537 n.13 (Tex. 2022). On the other hand, while both requirements achieve distinct goals, they do so in a related way. The "proximately caused" requirement of § 101.021(1) simply ensures that the familiar and ordinary proximate-cause standard in tort litigation (and not some lesser standard) be the outer bound of liability here, too, and that it be tethered to a governmental employee acting within the course and scope of his job. The "arises from" requirement in § 101.021(1)(A), in turn, narrows the universe of actions that fall within the statutory waiver—here, by including only certain actions with a link (or "nexus") to a motor-driven vehicle or equipment within the relevant waiver. As we discuss below, *see infra* Part III.B, this "arises from" requirement mandates an additional showing, but it is not a different *kind* of causation—it is still a proximate-cause requirement, just one that focuses on motor-driven equipment. In any event, like the applicability of certain exceptions to the Tort Claims Act's waiver of immunity addressed in Part II, we leave it to the parties and lower courts on remand to address § 101.021(1)'s separate causation requirement in the first instance, if need be.

16

homes. The City, on the other hand, argues that what the homeowners truly allege is *non*use: the City's *failure* to later *open* the floodgate and thus relieve the accumulated overflow. We think that, however one examines the essentially undisputed facts on the day in question, "the operation or use" of the gate is inseparable from the homeowners' tort allegations and the resulting property damage that they claim.

Decades ago, we expounded on the meaning of "operation or use" in the Tort Claims Act. We defined "use" as "to put or bring into action or service; to employ for or apply to a given purpose," *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989), and "operation" as "a doing or performing of a practical work," *id.* (internal quotations and citations omitted). These definitions, admittedly, are "not particularly enlightening," *PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 303 (Tex. 2019), but they reflect our effort to apply them in a way that conforms to common sense.

To that end, our cases require more than merely stating that government property plays a role in an alleged injury. Instead, they have been careful to distinguish between genuine use and nonuse. In *LeLeaux v. Hamshire-Fannett Independent School District*, for example, the plaintiff sued a school district for injuries she sustained when she hit her head on the rear door of a school bus. 835 S.W.2d 49, 50–51 (Tex. 1992). We held that because the bus was "parked, empty, with the motor off," the plaintiff was unable to show "operation or use" of a motor-driven vehicle and was thus unable to invoke the statutory waiver in § 101.021. *Id.* at 51–52. Similarly, in *Texas Natural Resource Conservation Commission v. White*, the plaintiff alleged that her store was destroyed

by fire after the Commission removed a motor-driven pump on her property that dissipated gas fumes from a nearby gasoline tank. 46 S.W.3d 864, 866 (Tex. 2001). We held that those allegations did not concern the "pump's operation or use" because the pump was not even "on [the plaintiff's] property when the fire began." *Id.* at 870 (internal quotations omitted). In so holding, we declined to equate "use" with "failure to use," for doing so "would be tantamount to abolishing governmental immunity" altogether. *Id.* at 870–71 (quoting *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 585 (Tex. 1996)). Hence our admonition in *City of North Richland Hills v. Friend*: that plaintiffs cannot "enlarge the scope of the waiver" by conflating use and nonuse through "artful pleading." 370 S.W.3d 369, 373 (Tex. 2012).

We remain heedful of this difference because, as we have often noted and reiterate above in Part II, § 101.021 is "a limited waiver of governmental immunity," *Alexander v. Walker*, 435 S.W.3d 789, 790 (Tex. 2014), and its precise scope must be clearly expressed. At the same time, however, we aim not to be unduly restrictive or to engage in sophistry in our understanding of "operation or use." They are, after all, "nothing if not common, everyday words" that "should be given their everyday meaning." *PHI,* 593 S.W.3d at 303. We have therefore declined to read the words of § 101.021 as "terms of art intelligible only to experts in the case law," *id.*, or as language burdened by "nit-picking technicalities" that do not "accompany other causes of action," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 285 (2012). As always, we construe the statutory text reasonably—and this approach, happily and perhaps unsurprisingly, often yields

18

reasonable answers.

The Southwestern Reporter has no shortage of examples. Our decisions in *PHI* and *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922 (Tex. 2015), are two among many others. In *Ryder*, a deputy sheriff pulled off on the side of a road and positioned his cruiser to face oncoming traffic—in the middle of the night with his headlights on. *Id.* at 926. The lights blinded a driver and a deadly car collision resulted. *Id.* We held that these allegations involved the "operation or use" of a "motor-driven vehicle" because the deputy was "not just operating the headlights—he was driving the car" at the time of the accident. *Id.* at 928. Our most recent § 101.021(1)(A) decision, *PHI*, also involved the disputed use of a vehicle. There, a state employee parked a van on an incline near a helipad, failed to engage the emergency brake, walked away, and allowed the van to roll down the incline and into a helicopter. *PHI,* 593 S.W.3d at 300. True, the employee was not in the van at the time it crashed, but these allegations still successfully invoked the statutory waiver because engaging the emergency brake was "an integral part of the 'operation or use' of a vehicle." *Id.* at 303–04. That the employee was not "actively operating" the van "at the time of the incident," as the officer was in *Ryder*, did not change our analysis. *Id.* at 305. "The statute," we noted, "does not explicitly require that the operation or use be 'active' or that it be ongoing 'at the time of the incident.'" *Id.*

Many of these cases, of course, have fact patterns that differ in various ways from the one now before us. Taken together, though, they illustrate how we have come to understand the scope of § 101.021(1)(A)'s potentially confusing "operation or use" requirement. As we observed in

19

*PHI*, "the multiplicity of possible fact-patterns and the vagaries of litigation can create complexity," which is precisely why we strive for "a simple construction" that will usefully guide the resolution of most cases without requiring expensive and time-consuming litigation. *Id.* at 303.

Applying that guidance to the facts here requires us to respectfully disagree with the conclusion reached by the court of appeals. The North Laredo Gate has a motor; city employees closed the gate during a rainstorm; and the flooding of the homeowners' properties happened soon after—within about an hour of—the closure. We think this is enough to conclude that the North Laredo Gate was put to "operation or use" as we have come to understand that phrase in § 101.021(1)(A). Closing the gate put it to its intended purpose: blocking water. And the act of closing the gate, along with the homeowners' property damage and the rainstorm itself, all occurred together as part of a single episode, giving them the "close temporal proximity" we spoke of in *PHI*, 593 S.W.3d at 305.

The City's response—that the homeowners actually complain about negligent *failure to open* the North Laredo Gate and thus the nonactionable *non*use of motor-driven equipment—proves too much. The only reason that the North Laredo Gate would have had to be opened was because, during the same storm, the City *closed* it. What matters here is that, as all parties agree, the North Laredo Gate is used to control waterflow in the resaca, the City closed the gate, and it was that *use* of the gate (the attempt to control waterflow) that immediately preceded and allegedly caused the flooding of the homeowners' neighborhood. These events, as alleged, fit comfortably within the scope of the statutory waiver and our precedent interpreting that waiver. Counsel

20

for the homeowners properly acknowledged that the analysis would be quite different if the gate had been closed long before—even *a day* before—the storm. *Then* the failure to open the gate would have been a matter of nonuse. But here, all the operative facts were part of the same larger narrative without any logical disconnect that could justify the City's theory.

Under this record, therefore, we see no meaningful way to separate the alleged "nonuse" (the failure to close the gate) from the immediately preceding "use" (the opening of the gate). In short, we conclude that, at least at this stage, the homeowners' allegations concern the "operation or use" of "motor-driven equipment" under § 101.021(1)(A) of the Texas Tort Claims Act.

## B

Our inquiry into the applicability of § 101.021 does not end there, however. The City also challenges the homeowners' tort claims under what we have called the statute's nexus requirement, which allows us to determine if the property damage has "arise[n] from" the operation or use of the North Laredo Gate. § 101.021(1)(A). The City argues, and a majority of the court of appeals agreed, that it did not. We hold that at this stage of the proceedings, the homeowners' allegations are sufficient to meet this causation requirement.

Much like "operation or use," the statutory phrase "arises from" does not explain itself, so in prior cases we have attempted to provide more guidance. In *LeLeaux*, we explained that it "requires a nexus between the injury negligently caused . . . and the operation or use of a motor-driven vehicle or piece of equipment." 835 S.W.2d at 51. "This

21

nexus," we have added, "requires more than mere involvement of property," and the property must do more than merely "furnish the condition that makes the injury possible." *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 543 (Tex. 2003). Rather, as we have stated before, "the equipment's use must have *actually caused* the injury." *White*, 46 S.W.3d at 869 (emphasis added).

We are aware, however, that we have not always been so plain in our descriptions of the "arises from" standard. The largest source of confusion in this area seems to derive from dicta in *Ryder*, in which we cited an insurance-policy dispute for the proposition that the statutory phrase "arises from" meant "something more than actual cause but less than proximate cause." 453 S.W.3d at 929 (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)). In some contexts, that in-between articulation of "arises from" can be accurate and helpful, but in *this* context it is not. *See PHI*, 593 S.W.3d at 302 (describing *Ryder* as "perhaps unhelpfully" articulating the standard); *see also Riojas*, 640 S.W.3d at 537 n.13 (rejecting the idea that claims under § 101.021(1)(A) require something less than proximate cause). That formulation is not susceptible to definite or useful guidance. Indeed, in *Ryder* itself, we quickly walked back this in-between standard, turning to the traditional proximate-cause standard in the very next sentence: "Accordingly, a plaintiff can satisfy the 'arising from' standard by demonstrating proximate cause." 453 S.W.3d at 929.[10]

---

[10] We held in *Ryder* that the defendant's conduct proximately caused the plaintiff's injuries and accordingly had no occasion to apply, much less further opine on, any other causation standard. Thus, we may depart from the in-between standard without being bound by the ordinary concerns of *stare*

Accordingly, we return, as we did in *Ryder*, to the familiar tort-law standard of proximate cause. Notably, this is also the very standard that § 101.021(1) announces in its text. To satisfy § 101.021(1)(A)'s nexus requirement, therefore, plaintiffs must show that the governmental employee's use or operation of the vehicle or equipment proximately caused the relevant injury.

"Proximate cause has two elements: cause in fact and foreseeability." *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). Cause in fact is established when "the act or omission was a substantial factor in bringing about the injury" and, without it, the harm would not have occurred. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985). Foreseeability, on the other hand, requires "the actor [to] have reasonably anticipated the dangers that his negligent conduct created for others." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019). The danger that must be reasonably anticipated is only the "general danger, not the exact sequence of events that produced the harm[.]" *Id.* In making this causal assessment, particularly in the Tort Claims Act context, we look to the record and pleadings to determine if the alleged cause is too geographically or temporally attenuated from the alleged effect. *Ryder*, 453 S.W.3d at 929–30.

Based on this standard, we hold that the homeowners, at least at

---

decisis. *See, e.g.*, Bryan A. Garner, et al., *The Law of Judicial Precedent* 44–45 (2016). Because it falls to us and not the lower courts to determine when statements in our decisions warrant revision, and because the consequences of the in-between standard are visited primarily upon the lower courts, we think it particularly important that we expressly disclaim that standard now.

this stage, have met their burden to create a fact issue on whether their property damage arose from the closure of the North Laredo Gate. After all, the temporal and geographic links are both tight. As we have concluded already, a close temporal proximity existed between the closing of the gate and the flooding of the homeowners' properties. The rainstorm, the gate's closure, and the flooding all happened within the same episode of events—one closely following the occurrence of the other. Likewise, the City does not suggest that there is any significant geographical attenuation between the gate and the homeowners' properties. Indeed, according to one of the homeowners' unrebutted allegations, the North Laredo Gate is the closest of the five gates in the resaca and is "immediately downstream" of Quail Hollow.[11] In this sense, the use/nonuse analysis and the nexus requirement understandably inform each other. Vast time gaps or vast distances could defeat *either* showing under these circumstances. But the existence of a logically defined single episode within a small spatial area, where the challenged governmental actions were undertaken both soon after and *because of* the downpour, makes it more likely (but certainly not guaranteed) that both the temporal and geographic showings can be made.

Despite these close geographical and temporal proximities, the City contends that the homeowners' property damage cannot be traced to the gate's closure. We agree with the City that it is the homeowners'

---

[11] We can also make a rough approximation of the physical distance between the North Laredo Gate and the homeowners' properties based on the deposition of Figueroa's supervisor, Santana Torres, who said that the distance between the North Laredo Gate and the South Laredo Gate is about five hundred yards.

24

burden to establish causation, not the City's burden to disprove it, and we subject the homeowners to the proper level of scrutiny. The City urges us to do that by viewing the homeowners' evidence and allegations as insufficient for two reasons. First, according to the City, it was *the rainstorm*, not the mere act of opening and closing the gate, that caused the damage. Second, the City argues, the flooding of Quail Hollow would have occurred regardless of whether the North Laredo Gate had been closed. The first argument presents primarily a legal question about the nature of the homeowners' claim; the second challenges the adequacy of the record to survive an attack on causation.

The City's first argument—that the rainstorm was the only but-for cause of the property damage—would render the homeowners' evidence essentially useless, for it rejects the idea that two events can work together to bring about a consequence. As the dissent below explained, the City's position is essentially predicated on a sole-factor-causation standard that our Tort Claims Act cases have not embraced. 647 S.W.3d at 724–25 (Hinojosa, J., dissenting) (citing cases). And as we have stated multiple times before, the tortious act can be a *substantial* factor in causing the injury, even if it is not the sole factor. *E.g.*, *City of Dallas v. Sanchez*, 494 S.W.3d 722, 726 (Tex. 2016); *Ryder*, 453 S.W.3d at 929. The homeowners can still establish causation if the rainstorm was necessary but not sufficient for the flooding of Quail Hollow. Put another way, if the same storm could have happened without Quail Hollow flooding, and it was the use of the gate that made the difference, the homeowners would satisfy a minimal requirement of causation.

The City's second argument—that the rainstorm made the

property damage inevitable *regardless* of the use of the North Laredo Gate—would defeat the homeowners' claim if the homeowners could not produce evidence that shows otherwise. But we think that they have met their burden of putting forth sufficient evidence to show that the closure of the gate proximately caused their property damage. For example, the homeowners allege, and the City does not dispute, that the water at the South Laredo Gate, in contrast to the water at the North Laredo Gate, had maintained a positive waterflow throughout the day. This discrepancy, the homeowners submit, indicated that the negative waterflow at the North Laredo Gate was only temporary. The homeowners also cite testimony from the City's Public Works Director, Santana Torres, and their expert witness, Lawrence Dunbar, who both opined that closing the North Laredo Gate had the effect of trapping water, which is what allowed the water to accumulate and overflow into the homeowners' properties. According to Dunbar, closing the gate "effectively prevent[ed] any water from flowing . . . in the Resaca." Torres similarly agreed that closing the gate meant that the water pouring into the resaca "just built up" and "had no place to go."

This evidence is far from dispositive, but it is enough for the homeowners to meet their burden of showing that the City's theory of causation (or the lack thereof) cannot yet be deemed established as a matter of law. Accordingly, "[w]e conclude that a fact issue remains as to whether the [property damage] 'arose from' the [City's operation of the gate]. At this stage of the proceedings, no more is required to satisfy section 101.021(1)(A)'s 'arises from' requirement." *PHI*, 593 S.W.3d at 303. And while we agree that the resolution of this issue implicates

jurisdiction, we have observed before that, "in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact." *Miranda*, 133 S.W.3d at 226. So too here.

## IV

The homeowners' allegations concern the "operation or use" of the North Laredo Gate and there is sufficient evidence at this stage for a factfinder to infer that the property damage arose from the gate's closure. The judgment of the court of appeals is therefore reversed and the case is remanded to the trial court for further proceedings.

Evan A. Young
Justice

**OPINION DELIVERED:** March 10, 2023

27